# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Nicholas Earley,<br><br>             Plaintiff,<br><br>v.<br><br>Paul Schnell, sued in his official capacity; and Edward Miles, sued in his individual capacity,<br><br>             Defendants. | Case No. 19-cv-1085 (WMW/HB)<br><br><br>**REPORT AND RECOMMENDATION** |

HILDY BOWBEER, United States Magistrate Judge

Plaintiff Nicholas Earley brings this action under 42 U.S.C. § 1983 alleging that Defendants, who are employees of the Minnesota Department of Corrections (DOC), violated his First, Eighth, and Fourteenth Amendment rights.  Defendant Paul Schnell, Commissioner of the Minnesota Department of Corrections, is sued in his official capacity and Defendant Edward Miles, Warden at the Minnesota Correctional Facility in St. Cloud (MCF-St. Cloud), is sued in his individual capacity.  This matter is before the Court on the parties' cross motions for summary judgment.  [Doc. Nos. 28, 35.] Defendants' motion is also a motion for judgment on the pleadings.  For the reasons set forth below, the Court recommends that Plaintiff's motion for summary judgment be denied in all respects, and that Defendants' motion be granted as to Earley's claims for damages and attorney's fees, all claims against Defendant Miles, and Earley's Eighth and Fourteenth Amendment claims against Defendant Schnell, but denied as to Earley's First

1

Amendment claim against Schnell. The Court further concludes that any claims based on Earley's incarceration should be dismissed as moot. Thus, the Court recommends that this case proceed forward only on Earley's count for declaratory and injunctive relief against Schnell based on the claim that Standard Condition 6 of his conditions of supervised release violates his First Amendment right to association with his fiancée Taylor Fisher.

## I.    Background

On May 8, 2016, Nicholas Earley and his fiancée, Taylor Fisher, were in a roll-over car accident. (Wright-MacLeod Decl. Ex. 1 [Doc. No. 41-1 at 3].) According to the Statement of Probable Cause that was sworn out in support of the criminal Complaint filed against Earley by Benton County Sheriff Troy Heck, Sheriff Heck responded to the scene of the accident and encountered Fisher, who had cuts on her hands and head and complained of head and back pain. (*Id.*) Heck spoke with Fisher before she was transported to the hospital, and she reported to him that she and Earley had been in an argument that started when Fisher picked up Earley from a bar earlier that evening because he was drunk. (*Id.*) The argument continued as Fisher was driving. Eventually, Fisher stopped the vehicle and told Earley to get out. (*Id.*) Earley got out but came around to the driver's side and pulled Fisher from the vehicle. (*Id.*) He got into the driver's seat, Fisher got into the passenger seat, and Earley then began driving at a high rate of speed. (*Id.*) Fisher dialed 911 for police assistance, at which point Earley grabbed Fisher's phone and tried to choke her. (*Id.*) The vehicle began to swerve, struck a sign, and then rolled over. (*Id.*) Fisher reported that Earley exited the vehicle and ran from the

scene.  (*Id.*)

After law enforcement and emergency personnel responded, neighbors found Earley hiding behind a tree.  (*Id.*)  He was observed to have a number of lacerations, and obvious signs of intoxication.  (*Id.*)  He was taken into custody and transported to the hospital for evaluation and treatment.  (*Id.*)  The Statement of Probable Cause also reports that Earley had a prior domestic assault conviction and a conviction for violating a no contact order.  (*Id.*)  It does not appear, however, that either of those prior convictions involved Fisher.

Earley was arrested and charged with First Degree Driving While Impaired, two counts of Domestic Assault, two counts of Criminal Vehicular Operation, and Driving After Cancellation.  (*Id*. at 1–2.)  The Benton County District Court also issued a criminal domestic abuse no contact order (DANCO) prohibiting Earley from having any contact with Fisher, going within three blocks of her residence, or engaging in any conduct that would threaten or harass her.  (Wright-MacLeod Decl. Ex. 2 [Doc. No. 41-1 at 7, 11].)

On or about December 21, 2016, Earley agreed to plead guilty to First Degree Driving While Impaired.  Pursuant to the agreement, the remaining counts were dismissed.  (Wright-MacLeod Decl. Exs. 3, 5 [Doc. No. 41-1 at 8, 18].)  In answers to Defendants' Interrogatories, Earley states that the DANCO was "cancelled" the same day he agreed to plead guilty.  (Wright-MacLeod Decl. Ex. 4 [Doc. No. 41-1 at 11].)  Earley was sentenced to 57 months, of which a minimum of two-thirds of the total sentence was to be served in prison, followed by conditional release for five years.  (Wright-MacLeod Decl. Ex. 3 at 9.)  Earley was committed to the custody of Defendant Schnell, the

3

Minnesota Commissioner of Corrections, on March 8, 2017.  (*Id*.)

Prior to his arrest, Earley and Fisher were living together.  (First Fisher Aff. ¶ 4 [Doc. No. 32].)  They have one son together, N.E., and they were also raising Fisher's son from a previous relationship, C.D.  (*Id*. ¶¶ 2–3.)  N.E. has autism and is non-verbal.  (*Id*. ¶ 9.)  During the first year of Earley's incarceration, Fisher and the boys visited Earley almost every week.  (*Id*. ¶ 6.)  However, on June 8, 2018, Fisher received a letter from MCF-Stillwater notifying her that she would no longer be able to visit Earley in prison under DOC Policy 302.100, which prohibits a victim from visiting an offender while the offender is incarcerated.  (*Id*. ¶ 10; First Scherf Decl. ¶ 3 [Doc. No. 40].)  The policy defines a "victim" as:

> [T]he individual or individuals named as a victim in the complaint, in any charging documents (complaints) that were dropped as part of a plea agreement where the offender/resident was convicted/adjudicated out of the same set of circumstances, as the subject of an active protective order, or as the subject of an active [D]epartment of [C]orrections no contact directive. The victim must be defined in the offender's active/current offense.

(First Scherf Ex. 2 [Doc. No. 40-1 at 5].)

Fisher states that she does not consider herself a victim, and both she and Earley deny that any assault occurred that night.  (Earley Aff. ¶ 8 [Doc. No. 33]; First Fisher Aff. ¶¶ 11–12; Second Fisher Aff. ¶ 3 [Doc. No. 47].)  Fisher appealed the visitation ban, but the DOC upheld its decision to prohibit in-person visits between Fisher and Earley.  (First Scherf Decl. ¶ 4; Ex. 3.)  Under DOC Policy 302.100, Fisher is considered a victim of Earley's current offense—even though the domestic violence-related charges were dismissed—because Fisher was named as a victim in the Complaint and Earley's First

Degree Driving While Impaired conviction arose out of the same "set of circumstances" as the allegations of domestic violence.  (First Scherf Ex. 2.)

Although Earley was no longer allowed to have in-person visits with Fisher at the prison, he was still allowed to have in-person visits with his son N.E., so long as an approved friend or family member escorted the child to and from the prison.  (First Scherf Decl. ¶¶ 4, 6; Exs. 6, 7.)  However, Fisher attests that such visits were "effectively impossible" because N.E.'s disability makes it difficult for N.E. to be in new places without his mother present and "for other people [besides Fisher] to understand his needs."  (First Fisher Aff. ¶ 9.)  For the most part, Fisher was unable to find a friend or family member to escort N.E. to visit his father, and, on those rare occasions when N.E. did visit Earley without Fisher present, N.E. had "meltdown[s]."  (*Id.*)

Earley was released from prison onto supervised release on May 7, 2020.  (Second Scherf Decl. Ex. 1 [Doc. No. 49-1 at 1].)  All individuals on supervised release receive a list of conditions with which they must comply while under supervision.  (Holmes-Larson Decl. ¶ 4 [Doc. No. 38].)  Some of these conditions are "standard," i.e., they apply to every offender, regardless of his offense or the level of supervision he receives.  Others are "special conditions," which are offender-specific and designed to account for the specific risks posed by the individual.  (*Id.*)  The supervising DOC agent "can consider a modification of conditions for an offender should there be a reduction of risk through programming and other means."  (*Id.* ¶ 8.)

Standard Condition 6 provides:

The offender must refrain from direct or indirect contact with any person

5

deemed to be a victim by the Department of Corrections, any person listed in a criminal justice agency report as a victim, or anyone whom a court has determined is in need of protection as demonstrated by a current or previous order for protection, harassment restraining order, or domestic abuse no contact order, without prior documented approval of the agent/designee.

(First Scherf Decl. Ex. 5 [Doc. No. 40-1 at 21].)  This term has been a standard condition of release since 2002 and is applied to all releasees.  (Holmes-Larson Decl. ¶ 7.)

Thus, although Earley is out of prison, Standard Condition 6 would still prohibit him from having any contact with Fisher.  As a result, among other things, he cannot reside with her, which effectively means that he cannot reside with their son N.E.

Earley filed this lawsuit on April 22, 2019, while he was still incarcerated, challenging both the DOC visitation policy that limited in-person visits and Standard Condition 6, which he correctly anticipated would be imposed upon his release.  Earley asserts Defendants have violated, and continue to violate, his First and Eighth Amendment rights, and his substantive due process rights under the Fourteenth Amendment, by prohibiting him from having in-person visits with his partner while he was incarcerated and by prohibiting him from living with his partner upon his release from prison.  (Compl. ¶¶ 29–30 [Doc. No. 1].)  He also alleges that because of his son's special needs, the effect of Defendants' policies as to him has also been to preclude him from seeing and participating in the life of his son.  Earley initially sought declaratory relief, an injunction enjoining Defendants from restricting him from in-person visits while incarcerated and from living with Ms. Fisher once released, an award of general damages and attorney's fees and costs, and any other relief the Court deemed appropriate.  (*Id.* ¶¶ A–E.)

The Court entered a Pretrial Scheduling Order on October 31, 2019, providing for a period of discovery to last until February 14, 2020. [Doc. No. 22 at 3.] The parties timely filed cross motions for summary judgment on May 4, 2020. [Doc. Nos. 28, 35.]

## II.    Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if the evidence is such that a reasonable factfinder could return a verdict for the non-moving party. *Id.* In considering a motion for summary judgment, the court views the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996). The party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials, but must set forth specific facts in the record showing there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(c)(1)(A); *Anderson*, 477 U.S. at 256.

In this case, the parties have filed cross-motions for summary judgment. "The filing of cross-motions does not concede the absence of a triable issue of fact. The court is bound in such cases to deny both motions if it finds . . . there is actually a genuine issue of material fact." *Jacobson v. Md. Cas. Co.*, 336 F.2d 72, 75 (8th Cir. 1964). However, such motions do "authorize the court to assume that there is no evidence which needs to be considered other than that which has been filed by the parties." *Harrison W. Corp. v.*

*Gulf Oil Co.*, 662 F.2d 690, 692 (10th Cir. 1981).  When faced with cross-motions, courts typically "consider each motion separately, drawing inferences against each movant in turn."  *EEOC v. Steamship Clerks Union, Local 1066,* 48 F.3d 594, 603 n.8 (1st Cir. 1995); *see also Buell Cabinet Co. v. Sudduth,* 608 F.2d 431, 433 (10th Cir. 1979) ("Cross-motions for summary judgment are to be treated separately; the denial of one does not require the grant of another.").  However, because of the overlapping nature of the cross-motions, the Court will consider these opposing motions simultaneously, but mindful of the separate inferences to be drawn in favor of each movant.  *See Wright v. Keokuk Cty. Health Ctr.*, 399 F. Supp. 2d 938, 946 (S.D. Iowa 2005).

Defendants' motion is also a motion for judgment on the pleadings.  Federal Rule of Civil Procedure 12(c) allows a party to move for judgment on the pleadings at any time after the pleadings are closed, so long as trial will not be delayed as a result.  Fed. R. Civ. P. 12(c).  A motion for judgment on the pleadings is evaluated under the same standard as a Rule 12(b)(6) motion to dismiss.  *Clemons v. Crawford*, 585 F.3d 1119, 1124 (8th Cir. 2009).  On a motion to dismiss brought under Rule 12(b)(6), "a court assumes all facts in the complaint to be true and construes all reasonable inferences from those facts in the light most favorable to the complainant."  *Wong v. Minn. Dep't of Human Servs.*, Case No. 13-civ-3378 (DWF/JSM), 2014 WL 4796464, at *3 (D. Minn. Sept. 26, 2014) (Frank, J.) (citing *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986)).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.

## III.    Discussion

Earley sued Paul Schnell, the Minnesota Commissioner of Corrections, in his official capacity, and Edward Miles, Warden at MCF-St. Cloud, in his individual capacity, seeking declaratory relief, injunctive relief, general damages, and attorney's fees and costs.

### A.    Claims That Earley Has Withdrawn and/or Are Moot

Earley initially sought an award of general damages for emotional distress resulting from his alleged constitutional rights violations.  In their motion, Defendants argue Earley's claim for damages should be dismissed for lack of subject matter jurisdiction since it is barred by the doctrine of sovereign immunity.  Earley does not argue to the contrary.  Instead, in his response to Defendants' motion for summary judgment, Earley states that his "main focus now that he has been released is reuniting with his family; as a result, he is no longer seeking damages and will not address the argument here."  (Pl.'s Resp. at 2 n.1 [Doc. No. 46].)  Even if Earley had not withdrawn his claim for damages, the Court would agree with Defendants on this point.  A plaintiff may not sue a state in federal court unless the state consents to the suit or Congress abrogates the state's sovereign immunity.  U.S. Const. amend. XI; *Skelton v. Henry*, 390 F.3d 614, 617 (8th Cir. 2004).  Neither is the case here.  *See Smith v. Fabian*, Case No. 10-cv-2193 (JRT/TNL), 2012 WL 1004982, at *3 (D. Minn. Mar. 25, 2012)

9

(explaining Congress did not make a clear statement of intent to abrogate states' Eleventh amendment immunity in enacting § 1983 and Minnesota has not waived its sovereign immunity as to § 1983 claims). Accordingly, the Court recommends granting Defendants' motion for judgment on the pleadings as to Earley's claim for general damages.

Additionally, Earley initially sought declaratory and injunctive relief, monetary damages, and attorneys' fees for the alleged violation of his constitutional right to association as a result of the implementation of the DOC's visitation policy while he was incarcerated. (*See generally* Compl.) However, because Earley has since been released from prison, he concedes that his claims relating to the restrictions imposed on him during his incarceration are now moot. (Pl.'s Resp. at 4 n.2.) *See Hickman v. Missouri*, 144 F.3d 1141, 1142 (8th Cir. 1998) ("Because plaintiffs have been released on parole and are no longer confined at WMCC, their claims are moot."). Accordingly, the Court recommends granting Defendants' motion for summary judgment as to all of Earley's claims relating to the DOC's visitation policy on the ground that they are moot.

## B.   Earley's Claims Against Miles

Earley's remaining claims against both Defendants seek declaratory and injunctive relief on the ground that Standard Condition 6 infringes one or more of his constitutional rights. Miles argues, and Earley does not dispute, that because Miles was sued only in his individual capacity, such relief is unavailable against him. Injunctive relief against government employees in their individual capacities is inappropriate because "a victory in a personal-capacity action is a victory against the individual defendant, rather than

10

against the entity that employs him." *Kentucky v. Graham*, 473 U.S. 159, 167–68 (1985).

Any injunctive relief Earley seeks that relates to Miles' actions is in the scope of his

official duty, not in his private role. *See Nix v. Norman*, 879 F.2d 429, 431 (8th Cir.

1989) ("Generally, individual-capacity suits involve actions taken by governmental

agents outside the scope of their official duties. Official-capacity suits typically involve

either allegedly unconstitutional state policies or unconstitutional actions taken by state

agents possessing final authority over a particular decision.").[1]

Accordingly, the Complaint fails to state a claim for injunctive or declaratory

relief against Miles in his individual capacity, and the Court therefore recommends that

Defendants' Rule 12(c) motion for judgment on the pleadings be granted as to that claim,

and that Earley's motion for summary judgment against Miles be denied.

**C.    Earley's Claims Against Schnell**

Earley alleges Schnell, in his official capacity, violated Earley's rights under the

First and Eighth Amendments and his substantive due process rights under the Fourteenth

Amendment. Both sides have moved for summary judgment in their favor as to Earley's

claims against Schnell.

Earley argues that, in applying Standard Condition 6 to him and thereby

forbidding all contact with Fisher, the mother and custodian of his child N.E., the DOC

violated his fundamental right to association as to both Fisher and N.E. (Compl. ¶ 30.)

---

[1] Even if Earley had sued Miles in his official capacity, Earley does not plausibly allege that the warden of MCF-St. Cloud would have the authority to prescribe or change the conditions for Earley's release, including the prohibition on his residing with Fisher.

Earley spends the bulk of his motion papers discussing the right to association as a substantive due process right, but clarifies that he believes it equally sounds in the First Amendment, "as the Supreme Court has considered claims as to this right in connection with both the First Amendment and the Fourteenth Amendment's Due Process Clause." (Pl.'s Mem. at 7 n.1 [Doc. No. 29].)  Indeed, "[t]he source of the intimate association right has not been authoritatively determined."  *Adler v. Pataki*, 185 F.3d 35, 42 (2d Cir. 1999).  *Compare Roberts v. United States Jaycees,* 468 U.S. 609, 618–19 (1984) (describing the right as a "fundamental element of personal liberty" of the sort protected by the Due Process Clause) *with City of Dallas v. Stanglin,* 490 U.S. 19, 23–24 (1989) (describing the First Amendment as "embrac[ing]" a right of association that includes intimate association).  The Court will therefore address Earley's freedom to associate claim in both contexts before turning to Earley's Eighth Amendment claim.

### 1.    Earley's Substantive Due Process Claim

Earley argues the Minnesota DOC violated his substantive due process rights[2] under the Fourteenth Amendment when it imposed a condition that prohibits him from any direct or indirect contact with Fisher without regard to the specific circumstances of his case and his family situation.  The Due Process Clause of the Fourteenth Amendment "protects individual liberty against 'certain government actions regardless of the fairness of the procedures used to implement them.'"  *Flowers v. City of Minneapolis*, 478 F.3d 869, 873 (8th Cir. 2007) (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 125

---

[2]  Earley does not raise a procedural due process challenge to the imposition of Standard Condition 6.

(1992)).  Where certain fundamental liberty interests are involved, a state may not interfere with them, even with adequate procedural due process, unless the infringement is "narrowly tailored to serve a compelling state interest."  *Reno v. Flores*, 507 U.S. 292, 301–02 (1993).  However, a plaintiff who seeks to show a violation of his substantive due process rights under the Fourteen Amendment bears a "very heavy burden."  *Hall v. Ramsey Cty.*, 801 F.3d 912, 917 (8th Cir. 2015).  "To balance competing interests in a substantive due process analysis, the question is not simply whether a liberty interest has been infringed but whether the extent or nature of the infringement is such as to violate due process."  *Id.* (internal quotations omitted); *see also Cty. of Sacramento v. Lewis*, 523 U.S. 833, 848 (1998) ("[T]he due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm.").

The Supreme Court has established that substantive due process limits what the government may do in both its legislative and its executive capacities, but the criteria to determine a due process violation differ depending on whether the claim is based on legislative or executive acts.  *Lewis*, 523 U.S. at 845.  In *Lewis* the Court established that the cognizable level of executive abuse of power is that which shocks the conscience.  *Id.* at 846.  The Eighth Circuit has incorporated that analysis into its approach to substantive due process challenges, reiterating that when it comes to the actions of a government official, a plaintiff must demonstrate *both* that the official "violated one or more fundamental rights that are deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist

if they were sacrificed," *and* that the official's "conduct was conscience-shocking."
*Slusarchuk v. Hoff*, 346 F.3d 1178, 1181–82 (8th Cir. 2003) (internal quotations omitted);
*see also Karsjens v. Piper*, 845 F.3d 394, 408 (8th Cir. 2017).

A different two-pronged analysis is applicable when a plaintiff alleges that
legislative action violated his substantive due process rights, as the courts have not
invoked the "shocks the conscience" standard in this context.  As with executive action,
the court must resolve first whether the legislative action infringed upon an individual's
fundamental liberty interest.  If so, the court applies strict scrutiny to determine if the
legislation is narrowly tailored to serve a compelling state interest; if not, the court's
review is limited to determining whether the legislation is rationally connected to a state
interest.  *Shrum v. Kluck*, 85 F. Supp. 2d 950, 961 (D. Neb. 2000), *aff'd sub nom. Shrum
ex rel. Kelly v. Kluck*, 249 F.3d 773 (8th Cir. 2001) (quoting *Reno v. Flores*, 507 U.S.
292, 302–03 (1993)); *Grove Assisted Living, LLC v. City of Frontenac, Missouri*, Case
No. 4:16-cv-1783 HEA, 2018 WL 3093520, at *3 (E.D. Mo. June 22, 2018).

The parties have not cited, and the Court has not found, a case in which the Eighth
Circuit has described the appropriate lens through which to review a substantive due
process challenge to a state-imposed condition of supervised release.  The Court has
found two cases in this District, however, involving such a challenge.  In *Hartman v.
Fabian,* the releasee, a level-III predatory offender, was required by the conditions of his
supervised release to find approved housing.  Case No. 11-cv-905 (DSD/AJB), 2012 WL
6737772, at *1 (D. Minn. Dec. 28, 2012).  When he was unable to do so, his release was
revoked and he was returned to jail.  *Id.*  He eventually brought a § 1983 action arguing

14

that the condition impinged his fundamental right to be free from wrongful and prolonged incarceration. *Id.* at *6. The court did not explicitly discuss whether the imposition of the condition was executive or legislative in nature, but granted summary judgment to the defendants on the ground that "[n]othing in the record suggest[ed] any malice, abuse of power, intent to harm or other behavior approaching the standard of conscience-shocking." *Id.*, citing the Eighth Circuit's analysis in *White v. Smith*, 696 F.3d 740, 757–58 (8th Cir. 2012) (finding intentionally manufacturing false evidence to convict a criminal defendant was conscience-shocking) and *Rogers v. City of Little Rock, Ark.*, 152 F.3d 790, 797 (8th Cir. 1998) (finding the rape of a woman by an on-duty police officer was conscience-shocking).

Similarly, in *Bandy v. Comm'r of Corrections*, Case No. 13-cv-2209 (JRT/LIB), 2016 WL 8732632, at *1 (D. Minn. Jan. 29, 2016), *report and recommendation adopted*, 2016 WL 1271469 (D. Minn. Marc. 31, 2016), *aff'd*, 683 F. App'x 551 (8th Cir. 2017), the court dismissed the plaintiff's § 1983 action challenging revocation of his supervised release on substantive due process grounds, finding that the complaint failed to allege facts sufficient to sustain a claim that the action of the Commission of Corrections shocked the conscience.

Several courts outside this Circuit have employed a similar analysis in evaluating substantive due process challenges to conditions of supervised release. In *Coleman v. Dretke*, 395 F.3d 216 (5th Cir. 2004), the United States Court of Appeals for the Fifth Circuit held that the state's imposition of a sex offender registration and therapy requirement to a parolee who had not been convicted of a sex offense did not constitute

15

the kind of arbitrary state action that "shocked the conscience," and therefore did not

violate his substantive due process rights.  *Id.* at 224–25.  The court explained:

> While these therapeutic measures are certainly intrusive, we do not believe
> that clearly established federal law, as determine by the Supreme Court,
> requires the conclusion that Texas's sex offender therapy "shocks the
> conscience."    In *County of Sacramento v. Lewis,* the Supreme Court
> reiterated its reluctance to expand the concept of substantive due process.
> While the core of substantive due process is protection from arbitrary
> government action, "only the most egregious official conduct" is arbitrary in
> the constitutional sense.  The Court noted that behavior most likely to "shock
> the conscience" and thus support a substantive due process claim is "conduct
> intended to injure in some way unjustifiable by any government interest."  In
> the present case, sex offender treatment serves the government interest in
> protecting members of the community from future sex offenses.  In addition,
> as invasive as the therapy appears, we doubt that the parole panel imposed
> the therapy condition with the intent to injure Coleman.

*Id.* (footnotes omitted).[3]  *See also, e.g.*, *Johnson v. Owens*, Case No. A-13-CA-394-SS,

2014 WL 11310170, at *4 (W.D. Tex. June 2, 2014), *aff'd in part, vacated in part*, 612 F.

App'x 707 (5th Cir. 2015); *Perry-Bey v. Virginia*, Case No. 3:12CV704, 2013 WL

2476491, at *2 (E.D. Va. June 7, 2013) (dismissing plaintiff's § 1983 action for failure to

state a claim for violation of his right to substantive due process where he failed to prove

both that the parole condition denied a "fundamental right" and that it "shocked the

conscience").

    But other courts have concluded otherwise, seemingly analyzing challenges to

state conditions of supervised release in a manner more akin to that applied to legislative

---

[3]  Notably, *Coleman* did conclude that the plaintiff had been denied his right to
*procedural* due process, *id.* at 222–23, but as already noted, Earley does not raise such a
claim here and the Court does not speculate about whether such a claim in the
circumstances of this case would have been well-taken.

acts.  Plaintiff relies heavily upon the decision of the United States Court of Appeals for the Second Circuit in *United States v. Myers*, 426 F.3d 117, 126 (2d Cir. 2005), to argue that this Court should not apply the "shocks the conscience" standard of *Slusarchuk* in this case, but should look instead at whether Standard Condition 6 is narrowly tailored to serve a compelling government interest.  (Pl.'s Mem. at 16.)  In *Myers*, the defendant appealed a sentence imposed by the federal district court that included a supervised release condition requiring the defendant to obtain authorization in advance for any visit with his minor son.  426 F.3d at 120.  The federal statute that governs the imposition by a federal court of a term of supervised release after imprisonment provides that, in addition to certain standard conditions of supervised release, the sentencing court may impose a further condition, provided, *inter alia*, that it "involves no greater deprivation of liberty than is reasonably necessary for the purposes set forth in [18 U.S.C. § 3553(a)]," which identifies the factors and goals to be considered in imposing a term of imprisonment.  18 U.S.C. § 3583(d)(2).  The defendant in *Myers* argued that the condition limiting his contact with his son unconstitutionally encroached upon the parent-child relationship because there was no evidence the defendant posed a threat to his son.  The Second Circuit stated:

> If a special condition implicates a fundamental liberty interest, we must carefully examine it to determine whether it is "reasonably related" to the pertinent factors, and "involves no greater deprivation of liberty than is reasonably necessary," 18 U.S.C. § 3583, and our application of these criteria must reflect the heightened constitutional concerns.  If the liberty interest at stake is fundamental, a deprivation of that liberty is 'reasonably necessary' only if the deprivation is narrowly tailored to serve a compelling government interest.

426 F.3d at 126.  Thus, it went on to explain, "when a fundamental liberty interest is implicated by a sentencing condition, we must first consider the sentencing goal to which the condition relates, and whether the record establishes its reasonableness."  *Id.*  The Second Circuit found, however, that the record from the district court was "inadequate on both prongs of the inquiry, allowing us neither to identify the goal to which the condition related nor to determine whether an undue deprivation of liberty occurred."  *Id.*  It therefore remanded the case to the district court to "create a full record" to determine whether the defendant (a non-custodial parent) had "any parental rights that trigger due process concerns," and if so, to tailor any special condition so that it "infringe[d] that right no more than necessary."  *Id.* at 128–29.

Although *Myers* involved an appeal of a sentence that imposed conditions of supervised release pursuant to 18 U.S.C. § 3583, the district courts within the Second Circuit have applied a similar analysis to cases challenging parole conditions imposed by the state.  *See, e.g.*, *Scott v. Rosenberger*, Case No. 19-cv-1769 (CS), 2020 WL 4274226, at *5 (S.D.N.Y. July 24, 2020); *Marquez v. Annucci*, Case No. 20-civ-1974 (AKH), 2020 WL 3871362, at *6 (S.D.N.Y. July 9, 2020); *Maldonado v. Mattingly*, Case No. 11-cv-1091 (SR), 2019 WL 5784940, at *8–*9 (W.D.N.Y. Nov. 6, 2019).  And at least one court outside of the Second Circuit, relying on *Myers,* has explicitly said that substantive due processes challenges to parole conditions should be considered as legislative acts, and therefore the conscience-shocking test does not apply.  *Goings v. Court Servs. & Offender Supervision Agency for D.C.*, 786 F. Supp. 2d 48, 68 n.11 (D.D.C. 2011) ("*Unlike the specific actions of government officials*, conditions of supervised release and

probation that implicate fundamental liberty interests are reviewed under the narrowly tailored standard." (emphasis added)).

But after careful review of *Lewis*, as well as Eighth Circuit precedent in the area of substantive due process (particularly the recent decision in *Karsjens v. Piper*), this Court is not persuaded that the Eighth Circuit would apply the reasoning of *Myers* and its progeny to a substantive due process challenge to a state-imposed condition of supervised release. Rather, the Court concludes that the appropriate standard to be applied here is the one that was described in *Slusarchuk* and applied by other judges in this District in both *Hartman* and *Bandy*, i.e., that Earley must demonstrate both that the imposition of the condition "violated one or more fundamental rights that are deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty" and that it was "conscience-shocking." *Slusarchuk*, 346 F.3d at 1181–82; *Hartman*, 2012 WL 6737772, at *6.

The Supreme Court has recognized a fundamental right "to enter into and maintain certain intimate human relationships," *Roberts*, 468 U.S. at 617, and has expressed great skepticism "when the government intrudes on choices concerning family living arrangements," *Moore v. City of East Cleveland, Ohio*, 431 U.S. 494, 499 (1977). Earley argues that Standard Condition 6 impinges on his relationship with Fisher, as well as his relationship with N.E., such that it violates this right. The application of Standard Condition 6 might well implicate a constitutionally-protected fundamental right—indeed, as discussed below, the Court perceives that it very likely does. But even assuming, *arguendo*, that it violates "one or more fundamental rights," Earley cannot show that it is

19

"conscience-shocking." "A plaintiff must establish the government action complained of is truly irrational, that is something more than . . . arbitrary, capricious, or in violation of state law." *Mills v. City of Grand Forks*, 614 F.3d 495, 498 (8th Cir. 2010) (alteration in original) (citation and internal quotation marks omitted). "Only the most severe violations of individual rights that result from the brutal and inhumane abuse of official power rise to this level." *White*, 696 F.3d at 757–58 (citation and internal quotation marks omitted).

The declaration of Rebecca Holmes-Larson describes the history, rationale and purpose of Standard Condition 6 as follows:

> [T]he standard condition of release imposed upon [Earley] prevents him from having any direct or indirect contact with the victims of his current or previous offenses without prior documented approval from his parole agent. This condition has been a standard condition of release since 2002 and is applied to all offenders on release. This condition is important for protecting public safety because it prevents offenders from re-victimizing their victims. Once an offender leaves prison, they are still under the custody of the DOC, but the DOC is not able to monitor the offender as closely as it did during the incarceration portion of their sentence. If an offender were to be able to live in a home with the victim of his current or previous offense, then it would be more difficult for the agent to supervise the offender and ensure that the victim is safe. This living situation would create a greater risk that the offender would re-victimize his victim, and it would decrease the chances that another individual would be able to intervene or report any violent or potentially violent behavior between the offender and victim. The DOC must therefore establish conditions of release that will protect the public and the victims of the offender.

(Holmes-Larson Decl. ¶ 7.)

The Court also takes note of the evidence in the record about the considerations underlying the more recent development of DOC Policy 302.100, which prohibits victims from visiting offenders while the latter are incarcerated (and which was applied to

prohibit Fisher from visiting Earley while he was incarcerated).  (Newlin Decl. ¶ 3 [Doc.

No. 39].)  That policy was developed by the DOC in collaboration with focus groups of

victims of domestic violence organized by the Minnesota Battered Women's Coalition.

(*Id.* ¶ 4.)  Those groups reported to DOC that "the offender maintained a significant level

of control" over them, even while incarcerated, and "used the visiting process to control,

and in some cases harass or re-victimize the victim."  (*Id.*)  They also indicated that they

felt pressure to visit their abuser in prison, in part out of a fear of "subsequent harm upon

the offender's release."  (*Id.*)

There is no question that, by definition, a "standard condition" of supervised

release does not take into account individual circumstances.  It follows that an

individualized assessment of Earley's situation could reveal that Standard Condition 6

impinges on Earley's relationship with Fisher more than is strictly necessary to meet the

DOC's goals.  But Earley does not even attempt to argue that the application of Standard

Condition 6 shocks the conscience, and he adduces no evidence that suggests any malice,

abuse of power, or intent to harm on the part of Defendant Schnell.  On this record, a

reasonable factfinder could not conclude that Standard Condition 6 "shocks the

conscience."  *Hartman*, 2012 WL 6737772, at *6.

Therefore, the Court recommends that Defendants' motion for summary judgment

on Earley's substantive due process claim against Schnell be granted, and that Earley's

motion for summary judgment on that claim be denied.

### 2.    Earley's First Amendment Claim

Earley also alleges Standard Condition 6 violates his First Amendment rights in

his relationships with Fisher and N.E.

The Court begins by considering Earley's relationship with N.E.  The Supreme Court has recognized "on numerous occasions that the relationship between parent and child is constitutionally protected."  *Quilloin v. Walcott*, 434 U.S. 246, 255, (1978); *see also United States v. Hobbs*, 710 F.3d 850, 853 (8th Cir. 2013).  Here, the record reflects that the prohibition on contact with Fisher could have particularly severe implications for the relationship between Earley and N.E. because N.E.'s disability makes it difficult for Earley and N.E. to communicate or see each other without Fisher present.  However, it is unclear whether the Eighth Circuit would recognize a First Amendment right to intimate association in the context of a relationship between a parent and child, as it has thus far only described such a right arising out of the Due Process Clause of the Fourteenth Amendment.  *Hobbs*, 710 F.3d at 853 ("The relationship between parent and child is a liberty interest protected by the Due Process Clause.").

But in addition, the Supreme Court has historically drawn a distinction between restrictions that explicitly or directly limit a fundamental right and those that do so indirectly or inadvertently.  *See, e.g.*, *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 450–51 (1988) (concluding that "incidental effects of government programs" on the First Amendment right to practice religion do not require government to offer a compelling justification for its otherwise lawful actions); *Bell v. Wolfish*, 441 U.S. 520, 550, (1979) (concluding that a regulation prohibiting prisoners from receiving hardback books unless mailed directly from publishers, book clubs, or

bookstores did not violate the First Amendment even though the rule might have incidental consequences such as increasing the cost of obtaining published materials).

In *Doe v. Miller*, the Eighth Circuit considered an Iowa state law that prohibited individuals convicted of certain sex offenses involving minors from residing within 2000 feet of a school or registered childcare facility. 405 F.3d 700, 704 (8th Cir. 2005). The plaintiff argued that the application of such living restrictions amounted to an "undue intrusion by the State" into his family and "intimate human relationships." *Id.* at 709–10. The Eighth Circuit disagreed because "the Iowa statute [did] not operate directly on the family relationship." *Id.* at 710. The court accepted that the restriction had "an incidental or unintended effect on the family" but held that that did not amount to an infringement of the plaintiff's constitutional liberty interest. *Id.* at 710–11. The restriction at issue in *Doe* limited *where* the plaintiff could live, not *with whom* he could live, but even so the Eighth Circuit's reasoning is applicable here. Although Standard Condition 6 almost certainly will have an effect on Earley's relationship with N.E., it is indirect and unintended. Therefore, the Court concludes the imposition of Standard Condition 6 does not amount to an infringement of any rights Earley may have under the First Amendment in his relationship with N.E.

But there is no question that the condition directly and intentionally targets Earley's relationship with Fisher, so the Court next considers Earley's First Amendment claim as it pertains to his right to association with Fisher. "[T]he First Amendment protects those relationships, including family relationships, that presuppose 'deep attachments and commitments to the necessarily few other individuals with whom one

shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life.'" *Bd. of Directors of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 545–46 (1987) (quoting *Roberts*, 468 U.S. at 619–20.) The Court has observed that "[d]etermining the limits of state authority over an individual's freedom to enter into a particular association . . . unavoidably entails a careful assessment of where that relationship's objective characteristics locate it on a spectrum from the most intimate to the most attenuated of personal attachments." *Roberts*, 468 U.S. at 620. As a result, it has not exhaustively described which family arrangements are entitled to constitutional protection, but it has extended the protection beyond marriage to include non-married partners and individuals who have and raise children together. *E.g.*, *Rotary Int'l*, 481 U.S. at 545 (1987); *Carey v. Population Services International*, 431 U.S. 678, 684–86 (1977); *Moore*, 431 U.S. at 503–04 (1977).

Earley argues his relationship with Fisher qualifies for this level of constitutional protection and, indeed, Defendants do not vigorously challenge that assessment. (*See* Defs.' Reply at 5 [Doc. No. 51] ("Earley arguably has a liberty interest in associating with Fisher as his life partner. . . .").) Earley and Fisher are engaged and had planned "to get married within a year of [Earley's] release date." (Early Aff. ¶ 2.) They lived together with N.E. and C.D. "as a family" before Earley's arrest and have "planned on continuing [their] lives together." (*Id.* ¶ 5.) Fisher states that not being able to visit Earley has caused her "a lot of emotional damage." (First Fisher Aff. ¶¶ 5, 7.) The Defendants offer no evidence to the contrary. Accordingly, the Court concludes that on this record, reasonable minds could not differ as to whether the relationship between

24

Earley and Fisher includes the kind of "deep attachments and commitments" that are the hallmarks of an intimate association. Furthermore, it is indisputable that Standard Condition 6, which prohibits all contact between Earley and Fisher, restricts Earley's ability to engage in that constitutionally protected relationship.

Generally, official action that burdens a fundamental right is subject to strict scrutiny. *See Roberts*, 468 U.S. at 617–18 ("[T]he Court has concluded that choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme.") In the prison setting, however, the United States Supreme Court has recognized that the "standard of review for prisoners' constitutional claims" must be "responsive both to the policy of judicial restraint regarding prisoner complaints and the need to protect constitutional rights." *Turner v. Safley*, 482 U.S. 78, 85 (1987). Thus, in *Turner*, the Supreme Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 89. The Court announced a four-factor test to inform that determination: 1) whether there is a rational connection between the policy and the legitimate government interest put forward to justify it; 2) whether there are alternative means of exercising the right; 3) the impact an accommodation of the asserted constitutional right would have on prison staff, other inmates, and prison resources; and 4) the absence of ready alternatives to the policy. *Id.* at 89–90. Application of these factors to determine the extent of First Amendment rights

in the penological setting is "a fact-intensive universe."  *Holloway v. Magness,* 666 F.3d 1076, 1079 (8th Cir. 2012).

True, there are obvious differences between the prison setting and supervised release.  But supervised releasees "remain[] in the legal custody and under the control of the commissioner, subject at any time to be returned to [prison] and the parole rescinded by the commissioner."  Minn. Stat. § 243.05, subd. 1(b) (2018).  (*See* Holmes-Larson Decl. ¶¶ 3, 7.)  Supervised release (or parole) is on the "'continuum' of state-imposed punishments," falling between imprisonment and probation.  *Samson v. California*, 547 U.S. 843 (2006).  Accordingly, courts have recognized that just as deference is due to penological determinations within the prison walls, so also should it extend to those imposed during supervised release, taking into account the difference in the challenges presented and the goals sought to be served in the two settings.  *See, e.g.*, *Felce v. Fiedler*, 974 F.2d 1484, 1495 (7th Cir. 1992) ("While the weight given particular circumstances in the application of the *Turner* reasonableness analysis may be somewhat different in the parole situation than in the prison situation, the basic responsibility of the state to the inmate and those around him remains constant despite the change in the degree of physical custody."); *Johnson v. Owens,* 612 F. App'x. 707, 711–12 (5th Cir. 2015) (reversing the district court's grant of summary judgment to the state on plaintiff's First Amendment challenge to a standard parole condition, and observing that "[w]hatever the exact formulation, the question before us is basically one of reasonableness; whether the . . . restrictions placed on Mr. Johnson are reasonably related to achieving important state goals such as protecting the public and encouraging

26

reintegration into society.").  This District's approach to reviewing First Amendment

challenges imposed on civil detainees is also instructive.  *See, e.g.*, *Ivey v. Johnston*, Case

No. 18-cv-1429 (PAM/DTS), 2019 WL 3334346, at *5 (D. Minn. July 24, 2019) ("To

determine whether MSOP residents retain a particular constitutional right given their civil

commitment, courts in this District have adopted a 'modified *Turner*' analysis….

recogniz[ing] that 'penological interests' were not the appropriate consideration, and

instead consider[ing] the challenged policy's reasonable relationship to legitimate

therapeutic and institutional interests.").

Having determined that Standard Condition 6 directly infringes Earley's First

Amendment right in his relationship with Fisher, the Court therefore turns to whether the

condition is reasonably related to important state goals sought to be served in the context

of supervised release, applying the analytical framework set forth in *Turner*.

With regard to the first *Turner* factor—whether a rational connection exists

between the regulation and the governmental interest advanced as its justification—the

Court has previously described the Defendants' rationale for Standard Condition 6,

including the concern for preventing re-victimization of domestic violence victims, and

the inherent difficulties of supervision when the offender is living with his alleged victim.

(Holmes-Larson Decl. ¶ 7.)

In his motion papers and at oral argument, Earley challenges the asserted rational

connection between Standard Condition 6 and the government's justification because the

condition broadly prohibits contact of all kinds between the releasee and "any person

deemed to be a victim by the Department of Corrections," which includes anyone named

27

as a current or past victim of the releasee in agency reports and anyone who has been

determined to be in need of a domestic abuse no contact order.  (First Scherf Decl. Ex. 5.)

Under that definition, Fisher is categorized as a "victim" both because she was identified

as such in the police report and because she was the subject of a DANCO.  But, Earley

emphasizes, the allegations of domestic violence against Fisher were never proven—

instead, he pleaded guilty to and was incarcerated for a different offense, Driving While

Impaired, and the domestic assault charges were dismissed as a part of the deal.  (Wright-

MacLeod Decl. Exs. 3, 5 at 8, 18).  This is a significant distinction, Earley insists, since

he was never "given the opportunity to refute the charges, and, when entering into the

plea agreement, it was his understanding that, because the assault charges were

dismissed, there would be no further implications." (Pl.'s Reply at 9 [Doc. No. 50].) [4]

Furthermore, he offers evidence that Fisher herself has recanted the accusations and does

not consider herself a victim (*see* First Fisher Aff. ¶¶ 11–12; Second Fisher Aff. ¶ 3).

Defendants respond that Standard Condition 6 is deliberately not limited to

releasees with domestic violence convictions; instead, releasees and their victims are not

permitted contact regardless of whether the offense is domestic violence-related.  They

point out that Earley's conviction arose out of the same set of factual circumstances as

the alleged domestic violence—the interactions between Fisher and Earley in the car and

the ensuing car accident—so it is beside the point that the domestic violence charge was

---

[4]  At oral argument, Plaintiff's counsel distinguished Earley's situation from that of a
releasee who had actually been convicted of domestic assault, and suggested that he
would not have the same constitutional concerns about the application of Standard
Condition 6 to the latter situation.

dropped pursuant to the plea agreement.

The Court finds Earley's argument that Fisher was not a victim of his conduct simply because the domestic assault charge was dropped to be unavailing. While Earley was not convicted of *assaulting* Fisher, Fisher was indisputably a victim of the conduct for which he *was* convicted. Neither Earley nor Fisher tries to suggest that his driving while impaired did not cause the roll-over accident that injured Fisher. Nor is it lost on the Court that Earley fled, leaving the injured Fisher at the scene. Therefore, to the extent Earley argues that Standard Condition 6 is unconstitutionally applied to him as a matter of law simply because he was not convicted of a domestic assault or because Fisher does not consider herself to be a victim of his crime, the Court is unpersuaded.

But that conclusion does not end the Court's analysis on this point. The question posed by the first *Turner* factor remains: Is there a rational connection between Standard Condition 6 and the legitimate governmental interests asserted as its justification? The Court recognizes the importance of the government's stated goals of protecting victims and community members, as well as the described challenges of supervision, particularly in the domestic setting. That said, the government's expressed rationale focuses primarily on the potential danger of a situation in which the offender and the victim *live together*, yet Standard Condition 6 prohibits much more than that, banning *any* "direct or indirect contact" whatsoever. Indeed, this prohibition is even more stringent than the restrictions Earley and Fisher faced while he was incarcerated, when they were still permitted to be in contact with each other, albeit not through in-person visits. The proffered connection between Defendants' stated goal—preventing violence in the

home—and the means—banning all contact whatsoever between the releasee and any alleged victim—is tenuous, particularly in view of the fact that Earley was not convicted or even tried for domestic assault against Fisher.  In short, while in general terms the Court can see a rational connection between Standard Condition 6 and the goals sought to be advanced by the state, the record does not clearly establish whether or not that connection exists as applied to Earley, i.e., why it is "reasonably necessary to severely restrict" him specifically, or why it is "necessary or reasonable to broadly categorize offenders in this manner."  *See Johnson*, 612 F. App'x at 713.  Accordingly, the Court finds a genuine issue of material fact exists with regard to the first *Turner* factor.

The second *Turner* factor assesses whether there are alternative means available to the plaintiff of exercising the right infringed by the restriction.  The Court concludes there is no disputed issue of fact as to this factor.  Standard Condition 6 is absolute; it does not permit *any* interactions between Earley and Fisher—even those conducted in public, under supervision, or remotely, by phone or email.  (First Scherf Decl. Ex. 5.) Indeed, Earley apparently cannot even send a message to Fisher via a third party.  This is an important distinction from the parallel provision governing Earley's interactions with Fisher while he was in prison: even after MCF-Stillwater notified Fisher that she would no longer be allowed to visit Earley pursuant to DOC Policy 302.100, the two were still allowed to communicate by phone and mail.  (First Scherf Decl. ¶ 4.)  Thus, so long as Standard Condition 6 is applied, Earley has no means of exercising his right to a relationship with his fiancée.

30

In order to evaluate the third *Turner* factor, the Court must first discern what Earley proposes as an accommodation. Earley does not appear to argue that Standard Condition 6 should be done away with altogether, but rather that the DOC should have conducted an individualized assessment before applying it to him. (Compl. ¶ 30.) The Court therefore interprets the third factor as requiring it to assess what impact an individualized assessment would have on prison staff, other inmates, and prison resources. Unfortunately, there is virtually no information in the record on this point. Neither Earley nor Defendants offer evidence as to what resources would be required to conduct such an individualized assessment, how an individualized assessment presents a reasonable alternative to the current system, or what additional resources would be required to supervise an individual in Earley's situation if contact with Fisher were permitted to a greater or lesser extent. Although there are surely some costs associated with conducting the assessment Earley demands, the record before the Court is not sufficient to evaluate them.

Likewise, the last *Turner* factor assesses whether there are ready alternatives to the policy, but as with the third factor, the record is not sufficiently well-developed to allow the Court to evaluate the merits of that argument. Defendants describe the current process by which a case manager from DOC works with the incarcerated person to develop a release plan and determine residency options. (Scherf First Decl. ¶ 7.) The release plan must ultimately be approved by a review team and the HRU, which makes the final decision on the conditions of release. (*Id.*) Nothing in the description of this

31

pre-release planning, however, suggests that the plan would or could depart from

Standard Condition 6.

Defendants also note that a releasee's supervising agent can modify the conditions

of release *after release* if there is "a reduction of risk through programming and other

means." (Holmes-Larson Decl. ¶ 8.) Specifically,

> An offender must make a request to modify a condition in writing to their
> supervising agent. The agent must review the request and decide whether
> modification is appropriate. This decision is typically made in light of the
> amount of time the offender has been on supervised release, compliance with
> their conditions of release, ability to maintain employment, and completion
> of relevant programming, such as anger management or therapy. If the agent
> determines that modification of the condition will not pose a risk to public
> safety or to the offender's victims, the agent will discuss the modification
> with their supervisor. If the supervisor approves the modification, then the
> agent will contact HRU. HRU reviews the request and decides whether to
> allow the modification.

(*Id.* ¶ 6.) Although this process offers a measure of individualized evaluation,

Defendants' counsel acknowledged during oral argument that there are no assurances

about whether or when such reviews would be undertaken, how long the process would

take, or what standards would be applied in determining whether to allow a modification.

Accordingly, the Court concludes that genuine issues of material fact remain as to

Earley's First Amendment claim regarding the impact of Standard Condition 6 on his

right to intimate association with Fisher, and the Court therefore concludes that summary

judgment would not be appropriate in favor of either Earley or Schnell on this claim.

### 3.    Earley's Eighth Amendment Claim

Finally, Defendants move for judgment on the pleadings or summary judgment on

Earley's claim that Standard Condition 6 violates his Eighth Amendment rights.[5]

(Compl. ¶ 30.)

The Eighth Amendment prohibits punishments that are "cruel and unusual." U.S. Const. Amend. VIII. Punishments are considered cruel and unusual in violation of the Eighth Amendment when they involve wanton and unnecessary infliction of pain or are grossly disproportionate to the severity of the crime. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981); *United States v. Collins,* 340 F.3d 672, 679 (8th Cir. 2003) ("The Eighth Amendment forbids only extreme sentences that are grossly disproportionate to the crime.") (quotations omitted). In considering an Eighth Amendment claim the court must be mindful that it embodies "'broad and idealistic concepts of dignity, civilized standards, humanity, and decency. . . .'" *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (quoting *Jackson v. Bishop*, 404 F.2d 571, 579 (8th Cir. 1968)).

Earley does not explain how Standard Condition 6 constituted cruel and unusual punishment as that term has been interpreted by the Supreme Court and the Eighth Circuit. He cites no case in which a condition of supervised release has been found to violate the Eighth Amendment.[6] In fact, he does not respond to Defendants' motion on this issue at all. The Court concludes that neither the Complaint nor the record would support a finding that the application of Standard Condition 6 to Earley violated the

---

[5] Earley does not mention his Eighth Amendment claim in his motion for summary judgment and so the Court concludes he does not move for summary judgment on this issue.

[6] *See United States v. Fields*, 324 F.3d 1025, 1027–28 (8th Cir. 2003) (determining that conditions of supervised release did not constitute cruel and unusual punishment based, in part, on the releasee's failure to cite a case in support of that proposition).

33

Eighth Amendment. Accordingly, the Court recommends that Defendants' motion as to this claim be granted.

## IV.    Recommendation

Based on all the files, records, and proceedings herein, the Court will recommend granting Defendants' motion for summary judgment or for judgment on the pleadings on the following claims: all claims for damages and attorney's fees; all claims against Defendant Miles; Earley's claims against Schnell insofar as they are grounded in the Eighth or Fourteenth Amendments; and Earley's First Amendment claim against Schnell based upon alleged interference with his relationship with N.E. The Court further recommends that any claims based on restrictions imposed during Earley's incarceration be dismissed as moot. The Court recommends denying both motions for summary judgment with regard to Earley's claim that Standard Condition 6 violates his First Amendment right to association with Fisher.

**Accordingly, IT IS HEREBY RECOMMENDED** that:

1.    Plaintiff's motion for summary judgment (ECF No. 28) be **DENIED**;

2.    Defendants' motion for summary judgment or for judgment on the pleadings (ECF No. 35) be **DENIED** as to Plaintiff's First Amendment claim based on his relationship with Fisher, and **GRANTED** in all other respects.

Dated: August 31, 2020              _s/ Hildy Bowbeer_____
                                    HILDY BOWBEER
                                    United States Magistrate Judge

34

**NOTICE**

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.  Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  *See* Local Rule 72.2(b)(2).  All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).